UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

RBC NICE BEARINGS, INC. AND          :
ROLLER BEARING COMPANY OF            :
AMERICA, INC.,                       :
     Plaintiffs,                    :
                                     :
v.                                   :          CIVIL ACTION NO.
                                     :          3:06-cv-1380 (VLB)
PEER BEARING COMPANY,                :
     Defendant.                     :          October 29, 2009

## MEMORANDUM OF DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOC. #143]

The plaintiffs, RBC Nice Bearings, Inc. and Roller Bearing Company of America, Inc. ("Plaintiffs"), brought this case for injunctive relief and damages against Peer Bearing Company ("Defendant" or "Peer"), asserting trademark infringement, unfair competition, advertising injury, and palming off/passing off claims in violation of Section 43(a) of the Lanham Act (15 U.S.C. § 1225(a)), a copyright infringement claim in violation of the Copyright Act (17 U.S.C. §§ 101 *et seq.*), and Connecticut state law claims for unjust enrichment, unfair competition, and violation of the Connecticut Unfair Trade Practices Act (CUTPA) (Conn. Gen. Stat. §§ 42-110a *et seq.*) and the Connecticut Unfair Sales Practices Act (CUSPA) (Conn. Gen. Stat. §§ 42-115e *et seq.*).  Presently pending before the Court is the Defendant's motion for summary judgment on all counts.  For the reasons set forth below, the Defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART.

## I.  Facts

The following facts relevant to the Defendant's motion for summary judgment are undisputed unless otherwise noted.

The Defendant, Peer, was founded in the early 1960's by Laurence Spungen. Beginning in the early 1960's, Peer began using 4-digit numbers in the "1600s" as model or part numbers for certain of its ball bearings.  These part numbers designate a size and type of bearing referred to as the "1600 Series" of bearings. Plaintiffs' predecessor, the Nice Ball Bearing Company ("Nice"), created the 1600 Series bearing designation and the numbers within this series.  Plaintiffs contend that the industry and consumers have recognized these designations as being associated with Nice since 1946, and that they and their predecessors spent substantial amounts of money to advertise and build up goodwill associated with these designations.  However, Peer claims that it adopted the 1600 Series term and 4-digit part numbers within the series to designate its ball bearings because several other manufacturers were already selling bearings using these numbers, such that designating a group of bearings as a series and the use of the 1600 Series designations to identify a particular group of ball bearings had become an "industry standard."

Peer has published various catalogs over the course of more than four decades using the terms at issue as well as other Series designations and part numbers that are not at issue in this litigation.  These catalogs were published in 1963, 1968, 1973, 1978, and most recently in 2005.  Plaintiffs also market their bearings through the use of catalogs.  Plaintiffs and their predecessor Nice have

2

published catalogs using the designations at issue, as well as other designations that are not the subject of this litigation,  in 1957, 1966, 1975, 1997, and 1999.  Only one of the catalogs that Peer allegedly infringed - Nice Catalog 240, published in 1966 - was registered with the United States Copyright Office at the time that Plaintiffs filed suit against Peer.  Each catalog prominently displays the name of its respective publisher.

Beginning in 2005, Peer expanded its use of the Series designations by including the term "7500 and 7600 Series" and the numbers within those series in its catalog.  The Defendant has sold bearings with these numbers since at least as early as 2002, and perhaps earlier, but Peer has no sales records from prior to 2002.  Nice began selling bearings with the 7500 and 7600 Series designations long before Peer began selling bearings with these designations.  The 7500 and 7600 Series designations were included in Nice's Catalog 190, published in 1957.  Peer also uses other bearing designations which Plaintiffs and their predecessor have long used, namely the "600 Series" and "6900 Series" designations, but Plaintiffs stipulated to a dismissal with prejudice of all claims concerning Peer's use of these designations on April 3, 2009 [Doc. #139].

The basic 4-digit part number within each relevant bearing series "corresponds to a bearing with a defined structure and dimensions."  Third Amended Complaint, ¶ 15.  Plaintiffs, Peer and other companies in the industry identify their bearings having the same dimensions with the same 4-digit part numbers.  However, companies in the industry use different suffixes added to the basic 4-digit part number to provide further information to the purchaser about the

3

source and characteristics of the bearing.  For instance, Peer uses the suffix "2RS" to designate a bearing within the 1600 Series as having a double seal, while Plaintiffs use the suffix "DC" to designate a bearing having a double seal.  The parties also use their own unique packaging trade dress affixed with their own trademarks (Plaintiffs affix the term "NICE" to their boxes, while Defendant uses the name "PEER" along with its "P" logo).

According to Plaintiffs, in addition to adopting their Series designations and the part numbers therein, Peer also copied proprietary fixed load ratings from their registered Catalog 240, even though those ratings are calculated using factors unique to Plaintiffs' bearings that were not applicable to Peer's bearings. Peer defines "load ratings" as "the radial force a particular bearing having known geometric and physical attributes, such as the size and quantity of balls, can withstand."  Def. 56(a)(1) Statement, ¶ 107.  Plaintiffs submit the deposition testimony of their engineer, Mr. Pallini, who stated that while load ratings are mainly a function of the geometry of the bearing and material, certain other "life factors" enumerated in published industry guidelines influence how load ratings are determined for a particular bearing, including tolerances, material cleanliness, lubrication, hardness, and operating temperature.  Pl. Ex. 11, Pallini Dep.

Approximately 80% of Peer's sales of 1600 Series bearings are directly to original equipment manufacturers ("OEMs"), and about 20% are made through distributors.  By contrast, 95% of Plaintiffs sales of 1600 Series bearings are made through distributors.  Customers of ball bearings typically test the bearings before purchasing them.  Furthermore, Plaintiff RBC's 2006 10-K states that it's

customers are "sophisticated and demanding, as our products are fundamental and enabling components to the construction or operating of their machinery." Def. Ex. 18.

Peer is currently owned by SKF, USA. ("SKF").  Prior to acquiring Peer, SKF owned the Plaintiffs' predecessor, Nice Ball Bearing Company ("Nice").  SKF sold Nice to Plaintiffs through an Asset Purchase Agreement ("APA") dated February 28, 1997.  Def. Ex. 20.  The APA lists the assets conveyed by SKF to Plaintiffs, but does not identify the Series terms or part numbers at issue as trademarks or other assets being transferred.  Instead, Schedule 3.18(a) to the APA, which purports to identify the trademarks being transferred from SKF to Plaintiffs, lists only the following trademarks: "NICE," "Nice logo," "Nice & Diamond Design," "Nice (Canada)," and "Nice - Logo (Canada)."  Def. Ex. 21.  Furthermore, SKF's former general counsel, Allen Belenson, stated in a declaration that the Series designations at issue were not considered to be trademarks at any point during his 24 years of employment at SKF.  Def. Ex. 19.  Although Plaintiffs contend that there were extensive discussions during negotiation of the transaction regarding the ownership and transfer of these designations, no provisions emerging from those discussions were memorialized in the APA and SKF did not expressly purport to sell or convey the alleged marks to Plaintiffs.

Plaintiffs first became aware of Peer in or around 1999 when they learned that Peer was offering bearing products within the 1600 Series product line to Ariens Company, a long-time customers of Plaintiffs.  Plaintiffs admit to learning of Peer's sales to Ariens Company in their Interrogatory Responses.  Def. Ex. 33.

5

In addition, Plaintiff RBC wrote a letter dated March 22, 1999 to Ariens suggesting that Ariens "[s]plit the business between Peer and Nice" in order to recapture some of the sales lost to Peer.  Def. Ex. 40.  Finally, Plaintiffs' deposition witness Mr. Werner testified that he recalled that Plaintiffs lost the Ariens sales to Peer in 1997 or 1998.  Pl. Ex. 6, Werner Dep.  Despite this evidence, the veracity of which they do not challenge, Plaintiffs assert that they were only "generally aware" of Peer in 1999 and did not truly become aware of Peer as a competitor until 2002 at the earliest.  Plaintiffs' deposition witnesses have testified that they had a meeting sometime in 2002 or 2003 in which they discussed business lost to Peer.  Pl. Ex. 13, Whipple Dep; Pl. Ex. 11, Pallini Dep.

As of 2004, there were at least 25 other companies selling 1600 Series bearings in competition with Plaintiffs.  In 2006, Plaintiffs filed applications to register the Series designations and certain of the part numbers at issue with the United States Patent and Trademark Office ("USPTO").  The USPTO rejected each of Plaintiffs' applications to register their "number marks" (1621, 1630, 1635, and 1641), finding that these part numbers are merely descriptive for ball bearings and do not function as trademarks.  Two of the examiners cited numerous third party uses of the numbers at issue to support their conclusion.  Nevertheless, Plaintiffs contend that the part numbers are unique marks developed by Nice that do not describe the specifications and features of the ball bearings they sell.

Several companies in the bearing industry filed oppositions to Plaintiffs' applications to register the Series designations.  Three companies - Kaydon Corporation, Schaeffler KC, and the Timken Company - settled their disputes and

6

dropped their oppositions.  The settlements agreements that the Plaintiffs negotiated with these parties include language acknowledging Plaintiffs' trademark rights in the designations at issue.  <u>See</u> Pl. Exs. 22-24.  In addition, General Bearing Company, another competitor of Plaintiffs, entered into a negotiated settlement agreement with Plaintiffs in which it acknowledged that Plaintiffs have trademark rights in the Series naming systems used for the Nice product line.  <u>See</u> Pl. Ex. 19.

Plaintiffs commenced this action against Peer on September 5, 2006.  On April 30, 2009, Peer moved for summary judgment on all counts [Doc. #143], asserting that 1) Plaintiffs' copyright claim is barred in part by the applicable statute of limitations, and barred completely because the elements of the work for which Plaintiffs seek copyright protection are not copyrightable; 2) Plaintiffs' trademark claims are barred by the doctrine of laches and because Plaintiffs' alleged marks are generic, or in the alternative, the alleged marks are descriptive and Plaintiffs have failed to provide evidence of secondary meaning and likelihood of confusion; and 3) Plaintiffs' state law claims are barred because they are preempted by the Copyright Act, because Plaintiffs have no trademark rights in the designations at issue, and because they were filed outside the applicable statutes of limitations.  Plaintiffs filed their opposition to Peer's motion for summary judgment on May 29, 2009 [Doc. #155].

## II.  Discussion

Summary judgment is appropriate only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine

issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'"  Bouboulis v. Transp. Workers Union of Am., 442 F.3d 55, 59 (2d Cir. 2006) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The moving party bears the burden of showing that no genuine issues exist as to any material facts.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323-25 (1986). If the moving party meets its burden, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must - by affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e).  "If the party moving for summary judgment demonstrates the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor."  Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp., 302 F.3d 83, 91 (2d Cir. 2002).

"The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture."  Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir.1990) (internal quotations and citations omitted).  A party also may not rely on conclusory statements or unsupported allegations that the evidence in support of the motion for summary judgment is

not credible.  Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993).

The court "construe[s] the evidence in the light most favorable to the non-moving party and . . . draw[s] all reasonable inferences in its favor." Huminski v. Corsones, 396 F.3d 53, 69-70 (2d Cir. 2004).  "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied."  Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH, 446 F.3d 313, 315 (2d Cir. 2006).

## A.  Copyright Claim

On October 27, 2009, this Court dismissed Plaintiffs' copyright infringement claims based upon works that were not registered with the United States Copyright Office at the time that this case was filed [Doc. #199].  Therefore, the Court now considers only Plaintiffs' claim for infringement of their registered copyright in Nice Catalog 240.  Plaintiffs allege that Peer's catalogs published in 1963, 1968, 1973, 1978, and 2005 infringe their copyright in Catalog 240.  As an initial matter, Peer argues that Plaintiffs' copyright claims based on material published in it's 1963, 1968, 1973 and 1978 catalogs should be dismissed on statute of limitations grounds.

The Copyright Act states that "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued."  17 U.S.C. § 507.  The Second Circuit has not ruled on the issue of whether a cause of action accrues when the copyright infringement occurs or when the copyright owner discovers (or should have discovered) the infringement.  See Auscape Int'l v. Nat'l Geographic Society, 409 F. Supp. 2d 235,

9

242 (S.D.N.Y. 2004).  Courts within the Second Circuit are divided on the issue.
Id. at 242-43.  In this case, Plaintiffs' claims for infringement based on Peer's
1963, 1968, 1973 and 1978 catalogs must be dismissed under either analysis.

Plaintiffs' sworn answer to Peer's Interrogatory No. 17 states:  "Plaintiffs
became aware that Peer was offering bearing products alleged to be equivalent to
products included within the Nice 1600 SERIES product line to Ariens Company,
a long-time customer of Plaintiff, in or about 1999."  Def. Ex. 33.  Peer has also
cited a March 22, 1999 letter from Plaintiff RBC to Ariens suggesting that Ariens
"[s]plit the business between Peer and Nice" in order to recapture some of the
sales lost to Peer.  Def. Ex. 40.  Finally, Plaintiffs' deposition witness Mr. Werner
testified that he recalled that Plaintiffs lost the Ariens sales to Peer in 1997 or
1998.  Pl. Ex. 6, Werner Dep.  Plaintiffs attempt to downplay the significance of
this evidence and create a disputed issue of material fact by conclusorily
asserting that while they were aware of Peer with respect to one customer in
1999, they did not become aware of Peer "as a competitor" until 2002-03.  This
argument is unpersuasive.  The evidence cited by Peer clearly shows that
Plaintiffs were aware that Peer was using their alleged 1600 Series marks at least
as early as 1999 and, in fact, that they lost sales to Peer in 1999 or earlier.
Accordingly, Plaintiffs' infringement claims based on Peer's 1963, 1968, 1973 and
1978 catalogs are barred by the statute of limitations.[1]

---

[1] Plaintiffs also argue that they are entitled to an injunction against Peer's
infringement of these four catalogs based upon the "continuing infringement"
doctrine.  However, the continuing infringement doctrine has been viewed with
disfavor in the copyright infringement context, and the Court declines to apply it

The sole remaining copyright claim for the Court to consider is Plaintiffs' claim that Peer's 2005 catalog infringed their copyright in Nice Catalog 240. "There are two elements to every claim of copyright infringement:  (1) possession of a valid copyright, and (2) copying of those elements of the work that are copyrightable."  <u>Key Publications, Inc. v. Chinatown Today Pub. Enterprises, Inc.</u>, 945 F.2d 509, 514 (2d Cir. 1991).  In order to be valid, a copyright must be "original" to the author.  The requisite level of originality needed to qualify for copyright protection is extremely low - only a slight amount will suffice. <u>R.F.M.A.S., Inc. v. Mimi So.</u>, 619 F. Supp. 2d 39, 51 (S.D.N.Y. 2009).  Even if the elements used in the work are not protectable standing alone, protection extends to the selection and arrangement of those unprotected elements in the final work, as long as the author's selection and arrangement are original.  <u>Id.</u> (citing <u>Feist Publications, Inc. v. Rural Telephone Service Co., Inc.</u>, 499 U.S. 340, 348 (1991)). Moreover, under 17 U.S.C. § 410(c), "the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate."

With respect to the first element, Catalog 240 was published on November 1, 1966, and was registered by Nice on November 14, 1966.  Def. Ex. 14.  Thus, Catalog 240 was registered within five years after publication, and Plaintiffs' copyright in Catalog 240 is prima facie valid.  However, Peer has presented evidence that the arrangements, layouts, data, tables, and other information

---

under the circumstances of this case because each catalog at issue was a separate work.  <u>See</u> <u>Kregos v. Associated Press</u>, 3 F.3d 658, 662 (2d Cir. 1993).

contained in Catalog 240 are substantially similar to those contained in Nice Catalog 190, which was published before Catalog 240.  <u>Compare</u> Def. Ex. 12 to Def. Ex. 13.  Peer further contends that the registration for Catalog 190 was not renewed, and that as a result Catalog 190 passed into the public domain and the information contained therein is not copyright protectable.  Based upon the apparent similarities between Catalog 240 and the previously published Catalog 190, the Court finds that there is a genuine issue of material fact as to whether Plaintiffs have a valid copyright in Catalog 240.  <u>See</u> <u>Folio Impressions, Inc. v. Byer California</u>, 937 F.2d 759, 763-64 (2d Cir. 1991) (presumption of copyright validity may be rebutted by evidence that work was copied from the public domain).

    With respect to the second element, the copyright owner must demonstrate that "(1) the defendant has actually copied the plaintiff's work; *and* (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's."  <u>Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.</u>, 25 F.3d 119, 122-23 (2d Cir. 1994).  Peer does not contest that it copied information from Plaintiffs' Catalog 240 and included this information in its 2005 Catalog.  Peer argues, however, that the elements it is alleged to have copied are elements for which there is no copyright protection.  In response, Plaintiffs assert that Peer copied "bearing load ratings" into its 2005 Catalog that are "proprietary and unique to RBC's bearings, and apparently not even

12

applicable to Peer's bearings."[2]  Plaintiffs claim that this load rating information is copyright protectable because Plaintiffs used "creativity" in developing and compiling it.  Peer argues, on the other hand, that bearing data are numerical facts representing the physical dimensions of Plaintiffs' bearings and the manufacturing tolerance target range applied to those dimensions, and therefore are not copyrightable.  See Feist Pubs., Inc. v. Rural Telephone Serv., 499 U.S. 340, 344-45 (1991) ("That there can be no valid copyright in facts is universally understood.").

The extent to which numbers such as the load ratings at issue here are copyrightable has not been fully clarified by the Second Circuit.  In CCC

---

[2]  **Plaintiffs also alleged in the Third Amended Complaint that Peer copied other information from Plaintiffs Catalog 240 in addition to bearing data, including "original drawings, unique layouts, designs and organization[.]" In addition, in their Supplemental Interrogatory Responses, Plaintiffs asserted that Peer copied their alleged trademarks.  However, in their opposition to Peer's motion for summary judgment, Plaintiffs have presented no argument or evidence to rebut Peer's contention that these elements are not entitled to copyright protection, and indeed, any arguments they could present would appear to be unavailing.  The bearing drawings are clearly intended to be accurate depictions of the bearings themselves, and therefore do not warrant copyright protection.  See, e.g., ATC Distribution Group v. Whatever It Takes Transmissions & Parts, Inc, 402 F.3d 700, 708-09 (6th Cir. 2005).  Plaintiffs' alleged trademarks, the Series terms and part numbers therein, are merely words and short phrases that are not subject to copyright.  See New York Mercantile Exchange v. Intercontinental Exchange, Inc., 389 F. Supp. 2d 527, 543-44 (S.D.N.Y. 2005); see also ATC Distribution Group, 402 F.3d at 708-09 (holding that transmission part numbers were not eligible for copyright protection).  Finally, with respect to the "layouts, designs, and organization" of the catalog, it is undisputed that Peer only copied particular information on certain pages of the catalog and did not copy the catalog wholesale or copy a substantial portion of the catalog.  Therefore, Peer cannot be liable for copying the arrangement of elements in the catalog as a whole.**

Information Services, Inc. v. MacLean Hunter Market Reports, Inc., 44 F.3d 61 (2d Cir. 1994), the Second Circuit held that the Red Book, a compilation of estimated projections for used car prices, merited copyright protection.  Rather than simply finding that the Red Book as a whole warranted copyright protection because of the original selection and arrangement of the data contained therein, the Second Circuit further stated that "[t]he valuations themselves are original creations of [Red Book's publisher]."  Id. at 67.  In so holding, the Second Circuit relied upon evidence that the valuations represented predictions by the Red Book editors of future prices estimated to cover specified geographic regions that were based on professional judgment and expertise, and were not merely reports of historical prices or mechanical derivations of historical prices.  Id.

Later, in New York Mercantile Exchange, Inc. v. Intercontinental Exchange, Inc., 497 F.3d 109 (2d Cir. 2007), the Second Circuit confronted the issue of whether NYMEX settlement prices for energy commodities futures contracts are copyright protectable.  A majority of the Second Circuit began by expressing the view that the market for futures contracts is an "empirical reality" or economic fact about the world.  Id. at 115.  Under this view, the majority noted, there is a "strong argument" that the settlement prices were facts being discovered, not predictions or estimates, and therefore lacked the requisite originality necessary for copyright protection.  Id.[3]  In a footnote, the Second Circuit characterized the

---

[3]  In a concurring opinion, Judge Hall disagreed with the majority's assertion that there is a "strong argument" that the settlement prices are not copyrightable.  In Judge Hall's view, there was an issue of material fact with respect to whether the prices were entitled to protection because these prices

14

Court's statement in <u>CCC</u> that the Red Book valuations themselves are original as arguably dicta because the Court in <u>CCC</u> found that the Red Book was a compilation deserving of protection due to the original selection and arrangement of data therein, and therefore it was not necessary to hold that the individual estimates were copyrightable. <u>Id.</u> at 115 n.5. The Second Circuit also distinguished <u>CCC</u> on its facts, finding that the used car prices at issue in <u>CCC</u> were editors' predictions of expected values for "average" vehicles, whereas settlement prices for futures contracts can be seen as "'preexisting facts' about the outside world which are discovered from actual market activity." <u>Id.</u> However, the Second Circuit ultimately declined to resolve the question of whether the settlement prices were sufficiently original to warrant copyright protection because it affirmed summary judgment on the basis of the merger doctrine. <u>Id.</u> at 116.

Although the state of the law regarding the copyrightability of numbers remains unclear, based upon the guidance provided by the Second Circuit in <u>New York Mercantile Exchange</u>, the Court finds the bearing load data at issue in this case to be unprotectable facts. Mr. Pallini, Plaintiffs' engineer, testified that load ratings are mainly a function of the geometry of the bearing and material. Pl. Ex. 11, Pallini Dep. Mr. Pallini further testified that certain other "life factors" influence how load ratings are determined for a particular bearing, including tolerances, material cleanliness, lubrication, hardness, and operating

_____

"arise from the integration of data sources" as well as "professional judgment or expertise," and thus were sufficiently creative to merit copyright protection.

temperature, and that these factors are enumerated in published industry guidelines.  Pl. Ex. 11, Pallini Dep.  Therefore, Mr. Pallini's testimony confirms Peer's view that the bearing load ratings are essentially a numerical representation of the physical characteristics of a particular bearing.  Plaintiffs' argument that creativity is used in developing the load ratings appears to be based upon the fact that certain bearing manufacturers use the various "life factors" enumerated above to adjust their load rating calculations from a standard calculation based only upon the geometrical features of the bearings.  Pl. 56(a)(2) Statement, ¶ 14.  While there may be some level of judgment involved in selecting which particular "life factors" to utilize in adjusting the standard load rating calculation, based upon the record before the Court such judgment is very minimal given that the relevant life factors are published in industry guidelines.  The level of judgment necessary to calculate the load rating information is undoubtedly no more than that needed to determine the settlement prices at issue in New York Mercantile Exchange, which were determined based upon the prices and circumstances of trading during the day as well as the opinion of a committee that reviewed market data.  And certainly, the facts in this case are distinguishable from CCC because the Red Book used car valuations were predictions of expected values for theoretical "average" vehicles, whereas the load ratings at issue in this case represent physical characteristics of a tangible product.[4]  Therefore, the Court finds that the numbers resulting from the

_____

[4]  The cases cited by Plaintiffs do not dictate a contrary result.  For instance, in Marshall & Swift v. BS&A Software, 871 F. Supp. 952, 959-60 (W.D.

adjustment of load rating calculations are merely mechanical derivations and are not eligible for copyright protection.

Even assuming that the load bearing ratings are expressions rather than facts, summary judgment on Plaintiffs' copyright claim would still be warranted in this case due to the application of the merger doctrine, which bars copyright protection for expressions that "merge" with the underlying idea.  "It has long been accepted that copyright protection does not extend to ideas; it protects only the means of expression employed by the author."  New York Mercantile Exchange, 497 F.3d at 116; see also 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.").  "To ensure free access to ideas, courts have applied the merger doctrine such that even expression is not protected in those

---

Mich. 1994), the Western District of Michigan found, as a matter of law, that the plaintiff's cost estimating tables for real estate valuations warranted copyright because the plaintiff used judgment and creativity in selecting which figures and values to utilize in order to develop the estimates listed in its tables.  Similarly, in Eckes v. Card Prices Update, 736 F.2d 859, 862-63 (2d Cir. 1984), the Second Circuit held that a baseball card collectors' price guide merited copyright protection because the publisher varied the prices based on the condition of the card and labeled certain cards as premium.  According to the Second Circuit, the publisher exercised sufficient creativity and judgment in the process of determining which of the 18,000 cards included in the guide were premium.  Id. These cases are inapposite to the issue before the Court.  Here, Plaintiffs are not claiming that the particular categories of information appearing in the tables that display the load ratings were included as the result of an original selection process.  Instead, they assert that the actual load rating numbers themselves are copyrightable because creativity was used in developing them.

instances where there is only one or so few ways of expressing an idea that protection of the expression would effectively accord protection to the idea itself."  New York Mercantile Exchange, 497 F.3d at 116-17 (internal quotation marks omitted).  To the extent that Plaintiffs are seeking to copyright the formula, process, or methodology used to determine load ratings, their claim is clearly barred by the merger doctrine.  If the "idea" is instead formulated as the radial force that a particular bearing can withstand, as Peer defines load ratings, then it cannot be disputed that all possible expressions take the form of a number.  The question then becomes whether the range of possible load ratings for a particular bearing "is broad enough that any possible expression will not necessarily be substantially similar."  Id. at 117.  As in New York Mercantile Exchange, Plaintiffs here have not met their burden of demonstrating a range of possible variations in the load ratings for a particular bearing that would preclude application of the merger doctrine.  See id. at 117-18.  Instead, Plaintiffs merely assert that they use "creativity" in developing load rating information.  This type of conclusory statement absent illustrative or demonstrative facts cannot defeat a motion for summary judgment.  See Colavito v. Organ Donor Network, Inc., 486 F.3d 78, 81 (2d Cir. 2007) ("A party may not defeat a Rule 56 motion based on conjecture alone.").

Finally, Plaintiffs also assert, without elaboration, that they use creativity in "compiling" the load rating information.  In Catalog 240, this information is arranged in tabular form listing each individual part number within a particular series along with the bearing information pertaining to each part number in

18

columns to the right of the part number.  As the Second Circuit has explained,
"when it comes to the selection or arrangement of information, creativity inheres
in making non-obvious choices from among more than a few options."  Matthew
Bender & Co., Inc. V. West Pub. Co., 158 F.3d 674, 682 (2d Cir. 1998).  If
information is selected or arranged in a fashion that has been done countless
times before and has thus become "garden variety," it is unoriginal and not
copyrightable.  Id.  For example, in PIC Design Corp. v. Sterling Precision Corp.,
231 F. Supp. 106, 111 (S.D.N.Y. 1964), the Southern District of New York held that
a tabular arrangement of data detailing the physical and mathematical
characteristics of precision gears was not subject to copyright protection.  The
Court found that the substantial similarities that appeared between the plaintiff's
table and the defendant's table resulted to some extent because there are very
few ways of listing this type of information and the general method used by both
parties was logical and to be expected.  Id.  Similarly, in Victor Lalli Enterprises v.
Bid Red Apple, Inc., 936 F.2d 671, 673 (2d Cir. 1991), the Second Circuit affirmed
the district court's entry of summary judgment in favor of the defendant on the
basis that charts compiling horse racing statistics were not entitled to copyright
protection.  Publishers of the charts used a common format, displaying the
results of horse races for periods of thirteen months with the months of the year
in a row across the top of the chart and the numbers 1 to 31 in a vertical column
to indicate the day of the month.  According to the Second Circuit, the plaintiff's
charts arranged factual data in "purely functional grids that offer no opportunity
for variation.  The format of the charts is a convention:  [the plaintiff] exercises

19

neither selectivity in what he reports or creativity in how he reports it."  Id. at 673.

Thus, the Second Circuit found that the plaintiff had failed to demonstrate the

minimal originality necessary to merit copyright protection.  Id.

Here, as in PIC and Victor Lalli, the tabular arrangement of load bearing

data cannot be considered sufficiently original so as to create an issue of

material fact precluding summary judgment.  There are very limited ways in which

this data could be presented, and presenting the data in a table format alongside

the bearing numbers to which they correspond is a logical and commonplace

method of presenting such data that lacks even the low amount of creativity

needed to qualify for copyright protection.

 Therefore, the Court concludes that the load rating data that Plaintiffs seek

to protect are facts describing the characteristics of the bearings that have not

been selected or arranged in an original fashion, and thus they are not copyright

protectable.  Furthermore, even if the load ratings are assumed to be

expressions, Plaintiffs' copyright infringement claim is still barred by application

of the merger doctrine.

### B.  Trademark Claims

Plaintiffs assert trademark claims under Section 43(a) of the Lanham Act

based upon Peer's use of the 1600, 7500, and 7600 Series terms as well as the

part numbers within each series.  Peer argues that summary judgment should be

granted on all of Plaintiffs' trademark claims for the following reasons: 1) these

claims are precluded by the doctrine of laches; 2) Plaintiffs' alleged marks are

generic and therefore not entitled to trademark protection; 3) the alleged marks

have not acquired secondary meaning; and 4) Plaintiffs have failed to demonstrate sufficient evidence of likelihood of confusion to withstand summary judgment.

The equitable defense of laches is a fundamental threshold matter that the Court must consider before reaching the merits of Plaintiffs' trademark claims. See Argus Research Group, Inc. v. Argus Media, Inc., 562 F. Supp. 2d 260, 272 (D. Conn. 2008). "A defendant claiming laches must show that: 1) the plaintiff had knowledge of the defendant's use of its mark; 2) the plaintiff inexcusably delayed taking action with respect to that use; and 3) the defendant would be prejudiced if the court permitted the plaintiff to assert its rights belatedly." Id. "Actual knowledge on the plaintiff's part is not required; rather, the issue is whether the plaintiff knew or should have known about the alleged infringing use." Id. With respect to the inexcusable delay factor, if the suit is brought outside the statute of limitations period, the delay is presumptively unreasonable. Id. (citing Conopco, Inc. v. Campbell Soup Co., 95 F.3d 187, 191 (2d Cir. 1996)). Because the Lanham Act does not include a statute of limitations, the most analogous statute of limitations applies, which in this case is Connecticut's three-year statute of limitations for fraud. See id.

Even if a defendant delayed in bringing suit, however, laches may be unavailable for several reasons, foremost of which is the equitable principal that "he who comes into equity must come with clean hands." Hermes Int'l v. Lederer de Paris Fifth Ave., Inc., 219 F.3d 104, 107 (2d Cir. 2000). This good-faith component of the laches doctrine bars the defense of laches where the defendant

21

intentionally infringed the plaintiff's trademark.  Id.

In this case, Plaintiffs argue that Peer is precluded from invoking the

doctrine of laches because it intentionally infringed Plaintiffs' alleged marks.

According to Plaintiffs, Peer's founder and President Laurence Spungen

expressed an intent to infringe their alleged marks during his deposition

testimony.  In particular, Plaintiffs contend that Mr. Spungen testified that Peer

adopted the marks "because of the reputation that RBC had built up."  Pl. Sur-

reply at 4.  However, Mr. Spungen's actual testimony with respect to his reasons

for adopting the 1600 Series term and part numbers fails to demonstrate bad

faith.  The relevant testimony is as follows:

> Q:  Did the fact that Nice was using the 1600 series in 1961 or 1962 have
> anything to do with your decision to choose the 1600 series for the sale of Peer's
> bearings?
> A:  I would say that had some influence, because it was a common - people
> knew the numbering system, so that was only one of the reasons. . . .
> Q:  In 1961 were you aware that customers for the 1600 series bearings
> associated Nice with the 1600 series?
> A:  I think that may only be one reason.  Sometimes they go by dimension
> and not refer to it as a Nice bearings, but they will say I want a dimension and
> they will give you a dimension.
> Q:  But are you aware that in 1961, in the 1961-'62 period, were you aware
> that customers in some respect associated Nice with the 1600 series bearings?
> A:  In some respect.
> Q:  And did that fact have anything to do with your decision to make Peer's
> bearings 1600 series bearings?
> A:  It's possible.  I mean, it's - it may not have been the main - main reason,
> because if it's - everybody's catalog, everybody is calling the 1600 series, it was
> not because Nice is doing it.  It's because it's there.

Pl. Ex. 1, Spungen Dep, at 84-85.  Mr. Spungen's testimony clearly

suggests that while he was aware when he adopted the 1600 Series bearings that

customers in some respect associated these bearings with Nice, his primary

reason for using the 1600 Series to designate his bearings was because everyone in the industry was already using these designations.  Furthermore, Mr. Spungen later testified that, at the time he adopted the 1600 Series designations, he did not believe that Nice bearings were good quality because the tolerances for the Nice bearings were below industry standard.  Id. at 89.  This testimony belies any inference that Mr. Spungen wanted customers to confuse or otherwise associate his bearings with Nice bearings.  Thus, when viewed in its entirety, Mr. Spungen's testimony indicates that he adopted Plaintiffs' alleged marks because they were commonly used in the industry, not due to a "fraudulent intent to capitalize on a competitor's reputation or good will."  Argus, 562 F. Supp. 2d at 276.  Plaintiffs have presented no further evidence of bad faith on the part of Peer.  Accordingly, the Court will consider the elements of Peer's laches defense on the merits.

The Court first addresses Defendant's laches defense as it applies to the 1600 Series designations.  With respect to the first factor of the laches defense, as discussed previously in the context of Plaintiffs' copyright infringement claim, there can be no dispute that Plaintiffs had actual or constructive knowledge of Peer's use of the 1600 Series designations in 1999.[5]  In their Interrogatory

---

[5]  Plaintiffs claim that although they knew of Peer with respect to one customer in 1999, they were not aware of Peer as a competitor until 2002 or 2003. To the extent Plaintiffs are attempting to rely upon the doctrine of progressive encroachment, their argument must fail.  "Under the doctrine of progressive encroachment, a plaintiff has some latitude in the timing of its bringing suit because the laches period begins to run, not at the first sign of a de minimus use, but rather, when the likelihood of confusion looms large."  Black Diamond Sportswear, Inc. v. Black Diamond Equipment, Ltd., No. 06-3508-cv, 2007 WL

Responses, Plaintiffs admit to becoming aware of Peer's sales of 1600 Series bearings to Ariens Company, a customer of Plaintiffs, in 1999.  Def. Ex. 33.  In addition, Plaintiff RBC wrote a letter dated March 22, 1999 to Ariens suggesting that Ariens "[s]plit the business between Peer and Nice" in order to recapture some of the sales lost to Peer.  Def. Ex. 40.  Finally, Plaintiffs' deposition witness Mr. Werner testified that he recalled that Plaintiffs lost the Ariens sales to Peer in 1997 or 1998.  Pl. Ex. 6, Werner Dep.  Indeed, it is likely that Plaintiffs had at least constructive knowledge of Peer's use of the 1600 Series designations much earlier than 1999, given that these designations appeared in Peer's 1963 catalog and Peer has sold bearings in the 1600 Series continuously since the early 1960's.

Second, the Court finds that Plaintiffs' delay in filing suit of at least six years after learning of Peer's use of the 1600 Series designations to be unreasonable.  Since the suit was brought outside the most analogous statute of limitations period of three years, Plaintiffs' delay in filing suit is presumed to be unreasonable, and Plaintiffs have failed to present any justification for the delay in order to rebut that presumption.

Finally, the Court concludes that Peer was prejudiced by Plaintiffs' delay in filing suit.  A defendant has been prejudiced by a delay when the defendant "has

---

2914452, at *2 (2d Cir. Oct. 5, 2007).  However, "the doctrine of progressive encroachment only excuses delay in filing suit where defendant, after beginning its use of the mark, *redirected* its business so that it more squarely competed with plaintiff."  Id.  Here, it is undisputed that Peer's bearings competed directly with Plaintiffs' bearings at least as early as 1999.

24

changed his position in a way that would not have occurred if the plaintiff had not delayed."  Conopco, 95 F.3d at 192.  Here, Peer relied upon Nice's and later Plaintiffs' failure to police and protect their alleged interests in the Series designations and part numbers at issue and their apparent acquiescence in the widespread use of these designations within the bearing industry for the preceding four decades prior to the filing of this lawsuit.  Peer relied upon this inaction to adopt other lines of bearings used by Plaintiffs, namely the 7500 and 7600 Series, and amended its catalog to include these lines of bearings.  Had Plaintiffs brought this action in a more timely manner, Peer may well have chosen some alternative method of identifying its bearings and would not have been in the position of defendant its longstanding practice of using Plaintiffs' alleged trademarks.  See id. at 193 ("Had [plaintiff] brought this action in a more timely manner, [defendant] might well have chosen some alternative position rather than fight a court battle . . .").

Moreover, having used the 1600 Series designations for decades, Peer will obviously be prejudiced if it is now required to develop new designations for this line of bearings and to educate its customers with respect to these new designations.  See Argus, 562 F. Supp. 2d at 274 (holding that defendant would be prejudiced by permitting plaintiff to belatedly raise trademark claims where defendant had made allegedly infringing information an important component of its publications for many years without objection from plaintiff).

This case exemplifies the rationale underlying the laches defense.  As the Supreme Court stated long ago, "The doctrine of laches is based upon grounds

of public policy, which require for the peace of society the discouragement of stale demands; and where the difficulty of doing entire justice by reason of the death of principal witness or witnesses, or from the transactions having been obscured by time, is attributable to gross negligence or deliberate delay, a court of equity will not aid a party whose application is thus destitute of conscience, good faith, and reasonable diligence." <u>Mackall v. Casilear</u>, 137 U.S. 556, 566 (1890).  Because the 1600 Series designations were adopted by Peer in the early 1960's, most if not all of the individuals who would have knowledge regarding the issues relevant to this case are now dead, and much of the relevant physical evidence, such as sales or publication records, no longer exists.

Due to the foregoing considerations, the Court holds that Plaintiffs' trademark claims based upon the 1600 Series designations are barred by the doctrine of laches.

The analysis is somewhat more difficult with respect to the 7500 and 7600 Series designations.  Bearings with the 7500 and 7600 designations first appeared in Peer's 2005 Catalog.  Peer admits that it has no evidence of sales of these bearings prior to 2002.  Plaintiffs' deposition witnesses have testified that they had a meeting sometime in 2002 or 2003 in which they discussed business lost to Peer.  Pl. Ex. 13, Whipple Dep; Pl. Ex. 11, Pallini Dep.  The exact date of this meeting does not appear in the record before the Court.  Nor is there any evidence of what specifically was discussed at the meeting.  Accordingly, there is no evidence that Plaintiffs were actually aware of Peer's sales of these bearings, and therefore the Court must consider whether the record evidence demonstrates

that Plaintiffs had constructive knowledge of Peer's use of the 7500 and 7600 Series designations more than three years prior to filing suit.  See Black Diamond Sportswear, Inc. v. Black Diamond Equipment, Ltd., No. 06-3508-cv, 2007 WL 2914452, at *3 (2d Cir. Oct. 5, 2007) ("A trademark owner is chargeable with such knowledge as he might have obtained upon due inquiry.").

In Black Diamond, the plaintiff brought suit alleging that the defendant infringed its use of the "Black Diamond" trademark on ski wear.  The plaintiff was aware as early as 1990 that the defendant was selling ski equipment using the Black Diamond mark.  Id.  However, the plaintiff did not know until several years later that the defendant was also selling ski wear with the Black Diamond mark and thus infringing upon the plaintiff's use of the mark.  Id.  The Second Circuit affirmed the district court's holding that the plaintiff's claim was barred by laches on the basis that the plaintiff should have known of the defendant's infringing use of the mark on its ski wear products.  Id.  The Second Circuit reasoned that the plaintiff was aware of the defendant's use of the Black Diamond mark on ski equipment as early as 1990 and that, had it exercised due diligence in policing its mark, the plaintiff would have readily discovered that the defendant was also selling ski wear in direct competition with the plaintiff's ski wear.  Id.  The Second Circuit noted that the plaintiff marketed its products in widely distributed catalogues, at yearly trade shows in which both companies participated, and through retail stores nationwide.  Id.  Thus, "had [the plaintiff] policed any of these obvious distribution channels from 1990 onwards, it would have known that the likelihood of confusion with [the defendant's] ski wear products loomed

large." Id.

As in Black Diamond, the Court finds here that Plaintiffs likely would have discovered Peer's use of the 7500 and 7600 Series designations had it exercised reasonable diligence in policing its mark prior to 2003.  Plaintiffs had actual knowledge of Peer's use of the 1600 Series designations in 1999.  Both Plaintiffs and Peer sell at least a portion of their bearings through distributors, and they compete in the same market of OEMs.  Therefore, it appears that Plaintiffs had readily accessible means of ascertaining the nature and scope of Peer's use of their alleged marks.  In addition, both Plaintiffs and Peer advertise their products in catalogs that are distributed throughout the industry.  Although the 7500 and 7600 Series designations did not appear in Peer's catalog until 2005, Peer's earlier catalogs contained other Series designations and corresponding part numbers used by Plaintiffs, including the 1600 Series, the 600 Series and the 6900 Series.[6]  See Def. Exs. 6-9.  Thus, had they investigated Peer in 1999 when they became aware of Peer's use of the 1600 Series designations, they likely would have discovered Peer's longstanding practice of using multiple Series designations and specific part numbers that appeared in the Nice catalog.  In these circumstances, it was "hardly far-fetched" for Plaintiffs to have anticipated that Peer would adopt additional designations used by Plaintiffs, and they likely would have discovered Peer's use of the 7500 and 7600 Series designations had they exercised reasonable diligence in policing their alleged marks because they

---

[6]  The parties have previously stipulated to the dismissal of all claims with respect to the 600 and 6900 Series designations.  See Doc. #139.

competed in the same market.  <u>Black Diamond</u>, 2007 WL 2914452 at *3.

Based upon the foregoing analysis, the Court is inclined to conclude that a presumption of laches applies with respect to Plaintiffs' claims based upon the 7500 and 7600 Series designations.  However, because of the marked difference in the manner in which the parties' bearings were sold and the paucity of facts concerning the bearings market in the record, the Court finds that there are genuine issues of material fact concerning the knowledge which can be imputed to Plaintiffs regarding Peer's use of the 7500 and 7600 Series designations. While both plaintiffs and Peer sell at least a portion of these bearings through distributors, there is no evidence that Peer uses the same distributors as Plaintiffs, and therefore, construing the evidence in the light most favorable to Plaintiffs, the Court cannot infer for purposes of this motion that Plaintiffs would have been able to determine Peer's use of the designations by asking a common distributor.  <u>See</u> <u>Hermes Int'l</u>, 219 F.3d at 109 (finding that the district court erred in holding that laches precluded plaintiff from recovering for seven types of knockoff handbags sold by the defendant where there was no evidence to suggest that Plaintiffs knew of the defendant's sales of six of the seven knockoffs).

Furthermore, as noted above, the record indicates that other Series designations and part numbers initially used by Nice to identify its bearings were also used by Peer and by other manufacturers.  These sketchy facts raise an issue not adequately addressed by the parties for purposes of this decision as to whether laches applies not just to the 1600 Series designation and part numbers

within that series, but to the system of using Series designations and part numbers within a series to identify bearings in general.  The Court notes that Plaintiffs can only avoid a presumption of laches if the trier of fact does not conclude that laches applies not just to a particular Series or part number, but rather to the Series designation and part number system first established by Nice and replicated by others in the ball bearing industry.

In addition, there is also an issue of material fact with respect to whether Peer suffered prejudice from Plaintiffs' delay in filing suit for infringement of the 7500 and 7600 Series designations.  As discussed above, Peer argues that it was prejudiced by Plaintiffs' delay because it adopted the 7500 and 7600 Series designations in reliance on Plaintiffs' inaction, and because it had been using Plaintiffs' designations since the 1960s and most if not all witnesses with information relevant to the case are now dead.  However, these arguments relate only to the 1600 Series designations.  Peer has not presented any argument as to how it has been prejudiced by any delay on the part of Plaintiffs in filing suit for trademark violations with respect to the 7500 and 7600 Series designations.  Peer did not publish a catalog using these terms until 2005, within the applicable limitations period.  Also, since the evidence on the record indicates that Peer first began selling 7500 and 7600 Series bearings in 2002, it must be inferred that there are witnesses available with relevant information with respect to these bearings who can testify at trial in this case.  Accordingly, the Court will consider the merits of Plaintiffs' trademark claims with respect to the 7500 and 7600 Series designations.

Before proceeding to consider the merits of Plaintiffs' claims, however, the Court addresses a particular threshold issue that the parties have not directly addressed in their briefs.  The issue is whether SKF actually transferred ownership of the 7500 and 7600 Series designations to Plaintiffs pursuant to the APA in 1997.[7]  Section 2.01(i) of the APA states that SKF is transferring to RBC "all of [Nice's] patents, copyrights, trademarks, trade names, service marks, service names, designs, know-how, processes, trade secrets, inventions, and other proprietary data[.]"  Def. Ex. 20.  However, the APA also includes a schedule purporting to list the trademarks being transferred to Plaintiffs, and this schedule does not list any Series terms or part numbers.  See Def. Ex. 21.  In the context of their secondary meaning argument, Plaintiffs present an affidavit from Michael Gostomski, Executive Vice President of Roller Bearing Company.  Mr. Gostomski states that, when SKF sold the Nice business to RBC, both parties agreed that SKF would transfer to RBC all intellectual property associated with the Nice business, including the ownership of the Series designations.  According to Mr. Gostomski, during negotiation of the APA, there were "extensive discussions" regarding transfer of the Series designations at issue and that the ownership of these designations was a "key item."  Pl. Ex. 20.  Notwithstanding the alleged centrality of these assets, the APA makes absolutely no mention of them, although it does list the specific trademarks which were intended to be sold.  See

_____

[7] Given the Court's finding of laches with respect to the 1600 Series designations, this issue is now relevant only to the 7500 and 7600 Series designations.

Def. Ex. 21.  Relying on the declaration of SKF's former general counsel Allen

Belenson, Defendants contend, on the other hand, that SKF never considered the

Series designations or part numbers to be trademarks and thus did not

contemplate or discuss transferring them to Plaintiffs.  Def. Ex. 19.  Therefore,

marginally there is an issue of material fact with respect to whether the APA

transferred ownership of the alleged marks to Plaintiffs.  At trial, Plaintiffs will

need prove that they own the designations at issue as a threshold matter.

 With respect to the merits of Plaintiffs' trademark claims, Peer first argues

that the alleged trademarks at issue are generic.  Peer further argues that, should

the Court instead find the alleged marks to be descriptive, they are not entitled to

protection because they have not acquired secondary meaning.  In order to

prevail on a claim under the Lanham Act, Plaintiffs must show that they have a

valid mark entitled to protection and that Peer's use of the mark is likely to cause

confusion.  Arrow Fastener Co., Inc. v. Stanley Works, 59 F.3d 384, 390 (2d Cir.

1995).  "Whether the mark is entitled to protection depends on whether it is

inherently distinctive or, if merely descriptive, has acquired 'secondary

meaning.'"  Id.  Under Second Circuit law, "the protection afforded a mark

depends on whether the mark is generic, descriptive, suggestive, arbitrary or

fanciful."  Id.  "A generic mark is generally a common description of goods and is

ineligible for trademark protection.  A descriptive mark describes a product's

features, qualities or ingredients in ordinary language, and may be protected only

if secondary meaning is established."  W.W.W. Pharm., Inc. v. Gillette Co., 984

F.2d 567, 572 (2d Cir. 1993) (internal citations omitted).  "Suggestive, arbitrary or

fanciful marks may be protected without a showing of secondary meaning.  A 'suggestive' mark offers suggestions of, but does not actually describe, the features of a product.  An arbitrary mark has an actual dictionary meaning, but that meaning does not describe the product.  A fanciful mark is a made-up-term."  Arrow Fastener, 59 F.3d at 391 (internal citations omitted).

Model numbers are "generally descriptive because they serve to distinguish a single source's products from each other."  Id.  This is true even if they do not refer to the physical characteristics of the item they demarcate.  Id.  Peer contends that Plaintiffs' alleged marks are generic because Plaintiffs and their predecessor Nice allowed longstanding use by third parties and have therefore abandoned them.  However, Peer's arguments relate primarily to the 1600 Series designations.  Peer has not submitted evidence regarding the extent of third party usage of the 7500 and 7600 Series designations, which Peer itself did not include in its catalog until 2005.  As stated earlier, the record suggests, but is insufficiently developed to establish at this stage, that the longstanding practice by companies in the bearing industry of using Series designations and corresponding part numbers to designate their bearings was so widely followed as to become a generic means of identifying ball bearings.  Plaintiffs, on the other hand, argue that the Series designations and part numbers are not generic or descriptive because they do not describe the physical dimensions of the bearings.  However, as the Second Circuit noted in Arrow Fastener, 59 F.3d at 391, model numbers are generally descriptive even if they do not refer to the physical characteristics of the product they demarcate.  Because Plaintiffs have

33

presented no evidence to show that the 7500 and 7600 Series designations are used for any other purpose than to designate particular bearings, the Court will assume for purposes of this motion that the alleged marks are descriptive.  This conclusion is supported by the findings of the Trademark Examiner which rejected Plaintiffs' attempts to register certain numbers within the 1600 Series as trademarks on the basis that these numbers merely identified particular bearings and were thus descriptive.  Def. Exs. 23-26.  Assuming that the designations at issue are descriptive, they can only be protected if they have acquired secondary meaning.

Whether a mark has acquired secondary meaning is determined by weighing the record evidence in light of the following six factors, with no single factor being determinative:  "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use."  ITC Ltd. v. Punchgini, Inc., 518 F.3d 159, 162 (2d Cir. 2008). The existence of secondary meaning raises factual questions usually inappropriate for summary judgment.  See DC Comics Inc. v. Reel Fanasy, Inc., 696 F.2d 24, 26-27 (2d Cir. 1982).

Plaintiffs submit that they have adduced evidence of secondary meaning with respect to factors (1), (2), (5) and (6).  First, Plaintiffs have provided advertising expenditures for their catalog and website as a whole, although they have not broken down expenditures for the particular designations at issue because advertising expenditures are not accounted for in such a fashion in the

34

bearing industry.  Second, while Plaintiffs did not conduct any consumer studies, they point to the testimony of Mr. White, a bearing distributor, who testified that he recognized the designation "1602" as a NICE bearing.  Plaintiffs have not presented any evidence of customer recognition of the 7500 and 7600 Series designations, however.  Plaintiffs also submit that the bearing industry has recognized the designations, including the 7500 and 7600 designations, as being associated with Plaintiffs because certain competitors who filed oppositions to Plaintiffs' trademark applications have since settled and withdrawn their oppositions and acknowledged Plaintiffs' rights in those designations.  Third, Plaintiffs argue that Peer has plagiarized their alleged marks and that Peer's President did so with the intent to confuse bearing customers.  Finally, there is evidence in the record that Plaintiffs and their predecessors have used the 7500 and 7600 Series designations since at least as early as 1957, the date of publication of Nice Catalog 190 which includes these designations.

There are certain problems with the evidence on which Plaintiffs rely to establish secondary meaning.  For instance, Plaintiffs' evidence of customer recognition relates to 1600 Series designations, and therefore is not probative of customer recognition of the 7500 and 7600 Series designations.  Similarly, the evidence of industry recognition in settlement agreements with certain third parties that Plaintiffs submit as exhibits should be accorded little probative weight because the reason why the third parties entered into these agreements is not apparent or even implicit in the record and they may very well have had legitimate reasons for settling with Plaintiffs apart from the merits of their

35

oppositions.  Peer has admitted to adopting Plaintiff's 7500 and 7600 Series designations for their bearings, but there is no evidence that it did so with the intent to confuse customers as to the source of the bearings and the bearings were sold directly to commercial purchasers through catalogs displaying prominently the Peer name and including other Peer bearings that as far as the record indicates were used exclusively by Peer.  Furthermore, as Peer correctly points out, Plaintiffs have not submitted any evidence of unsolicited media coverage or sales figures for the 7500 and 7600 Series bearings.

Nevertheless, viewing the evidence in the light most favorable to Plaintiffs, the Court finds that there are issues of material fact with respect to secondary meaning that militate against granting summary judgment in favor of Peer on this issue.  In particular, the Court credits Plaintiffs' evidence of the length of time that it has used the 7500 and 7600 Series designations.  These designations appeared in Nice Catalog 190, published in 1957.  Peer argues that, while Plaintiffs have demonstrated the length of their use of the alleged marks, such use has not been exclusive.  However, Peer's evidence of use by other bearing manufacturers relates to the 1600 Series designations, not to the 7500 and 7600 Series designations.  As far as the record indicates, Peer itself began using these designations in 2002, and there is no evidence that other bearing manufacturers used these designations during the sixty-plus year span in which Plaintiffs were using them.  Additionally, Plaintiffs have submitted advertising expenditures for their catalogs, and the fact that they have not broken down these expenditures by designation cannot be weighed against them because they have submitted

36

evidence that this method of advertising is standard in the bearing industry.  The specific weight to be accorded to each of the six factors enumerated by the Second Circuit in light of the evidence presented in this case is a determination more properly made by the trier of fact than by this Court at the summary judgment stage.

Peer further argues that Plaintiffs have not demonstrated that Peer's use of their alleged trademarks has created a likelihood of confusion.  Assuming that Plaintiffs are able to establish at trial that the 7500 and 7600 Series designations have acquired secondary meaning, in order to recover on their Lanham Act claims they must further demonstrate that Peer's use of these designations has created a likelihood of confusion on the part of customers.  The Second Circuit has developed an eight factor test to be used in determining likelihood of confusion.  See Polaroid Corp. v. Polaroid Elecs. Corp., 287 F.2d 494, 495 (2d Cir. 1991).  The eight Polaroid factors are: "(1) the strength of the mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the prior owner will 'bridge the gap'. . .; (5) actual confusion; (6) the defendant's good faith in adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of the buyers."  Arrower Fastener, 59 F.3d at 391.  "This list of Polaroid factors is not exclusive and the analysis of the factors is not a mechanical process."  Id. (internal quotation marks omitted).  And while questions regarding the likelihood of confusion are normally factual in nature, "summary judgment is appropriate if the court is satisfied that the products or marks are so dissimilar that no question of fact is presented."  Universal Studios,

**Inc. v. Nintendo Co., Ltd.**, 746 F.2d 112, 116 (2d Cir. 1984).

Here, the Court concludes that there are issues of material fact with respect to several of the <u>Polaroid</u> factors.  For instance, the inquiry regarding the strength of a mark parallels the inquiry concerning the mark's validity.  <u>See</u> <u>Arrow Fastener</u>, 59 F.3d at 391.  Thus, whether the 7500 and 7600 Series designations have acquired secondary meaning is relevant to the determination of the strength of these marks, and the Court has already concluded that there are issues of material fact with respect to secondary meaning.  Similarly, Peer uses the same number designations within the 7500 and 7600 Series for its bearings, but the parties utilize their own unique packaging trade dress and use different suffixes for their bearings, which raises a question of fact as to whether the similarity of the marks is likely to cause confusion among potential customers, especially because buyers are commercial entities and not retail customers.  The third and fourth factors appear to favor Plaintiffs, because both Plaintiffs and Peer sell ball bearings and ultimately compete in the same market, although Plaintiffs sell primarily through distributors while Peer mostly sells directly to OEMs.  By contrast, the fifth and eighth factors appear to favor Peer.  Plaintiffs have provided no evidence of actual confusion involving the 7500 and 7600 Series designations, and the single instance they do cite involved an unidentified company that had been selling 1600 Series bearings in Plaintiffs' Nice boxes, which does not at all support a finding that Peer's sales of bearings in its own unique packaging caused any customers to be confused as to their source.  With respect to the sophistication of customers, Peer has presented evidence that

bearing customers tend to test the bearings before purchasing them, and RBC's 10-K expressly states that their customers are sophisticated.  The sixth and seventh factors do not appear to favor either party at this stage.  With respect to the sixth factor, the parties have not made the Court aware of any evidence bearing on the issue of why Peer adopted the 7500 and 7600 Series designations specifically, and therefore Peer's good faith (or lack thereof) cannot be ascertained.  The seventh factor "is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality."  Id. at 398.  While there is evidence in the record to suggest that Peer's bearings were in fact higher quality than Plaintiffs' bearings when Peer adopted the 1600 Series designations in the 1960's, the parties have failed to submit evidence as to the respective quality of the Plaintiffs' 7500 and 7600 Series bearings in comparison to the quality of Peer's 7500 and 7600 Series bearings.  Thus, given that the Polaroid factors used to determine likelihood of confusion do not clearly favor either party, the Court holds that the weighing of the factors is more appropriately left to the trier of fact.

Therefore, because there are issues of material fact with respect to secondary meaning and likelihood of confusion, the Court denies summary judgment as to Plaintiffs' trademark claims based upon Peer's use of the 7500 and 7600 Series designations.

### C.  State Law Claims

In addition to its federal claims under the Copyright Act and Lanham Act, Plaintiffs also bring Connecticut state law claims for unjust enrichment, unfair

competition, and violation of CUTPA and CUSPA.  Peer argues that summary

judgment should be granted on these claims because they are preempted by the

Copyright Act, because Plaintiffs have no trademark rights in the Series terms

and part numbers at issue, and because they are barred by the applicable

statutes of limitations.

Under Second Circuit law, the Copyright Act preempts a state law claim

when (1) "the particular work to which the claim is being applied falls within the

type of works protected by the Copyright Act," and (2) "the claim seeks to

vindicate legal or equitable rights that are equivalent to the bundle of exclusive

rights already protected by copyright law."  Briarpatch Ltd., L.P. v. Phoenix

Pictures, Inc., 373 F.3d 296, 305 (2d Cir. 2004).  The state law claim must not

include any extra elements that make it qualitatively different from a copyright

infringement claim.  Id.  The Second Circuit takes a "restrictive view" of the extra

elements that transfer an otherwise equivalent claim into one that is qualitatively

different from a copyright infringement claim.  Id. at 306.

A review of the Third Amended Complaint reveals that Plaintiffs' state law

claims are based upon the same allegations supporting their federal trademark

and copyright claims.  Furthermore, Plaintiffs' Interrogatory Responses indicate

that they plan to rely upon virtually the same evidence to support each of their

claims.  Def. Exs. 34 and 35.  Plaintiffs make no attempt in either the Third

Amended Complaint or in their Interrogatory Responses to distinguish the

separate elements of each of their state law claims.  Instead, Plaintiffs argue in

their sur-reply that Peer's "bad faith copying goes above and beyond the

40

elements of copyright infringement."  However, the Second Circuit has held that awareness and intent are not extra elements that make a state law claim qualitatively different from a copyright infringement claim.  <u>Briarpatch</u>, 373 F.3d at 306.  Accordingly, Plaintiffs' state law claims are preempted by the Copyright Act insofar as they rely upon Peer's copying from Plaintiffs' catalogs.  <u>See</u> <u>ATC Distribution Group, Inc. v. Whatever It Takes Transmission</u>, 402 F.3d 700, 713-14 (6th Cir. 2005) (citing <u>NBA v. Motorola, Inc.</u>, 105 F.3d 841, 849 (2d Cir. 1997)).[8]

The Lanham Act does not preempt state law, and therefore Plaintiffs state law claims are not preempted to the extent that they assert Peer's violation of Plaintiffs' alleged trademark rights.  <u>See</u> <u>20th Century Wear, Inc. v. Sanmark-Stardust, Inc.</u>, 747 F.2d 81, 93 n.15 (2d Cir. 1984).  However, Peer argues that these claims are barred by the applicable statutes of limitations.  CUTPA, upon which Plaintiffs rely in part for several of their state law claims, has a statute of limitations of three years.  Conn. Gen. Stat. § 42-110g(f).  CUSPA does not have a specific statute of limitations, nor is there a specific Connecticut statute of limitations for unfair competition and unjust enrichment, and therefore the general Connecticut statute of limitations for any action based in tort of three years applies to these claims.  Conn. Gen. Stat. § 52-577.

---

[8]  **The fact that the Court has granted summary judgment on Plaintiffs' copyright claim does not preclude the preemption of their state law claims.  <u>See</u> <u>NBA</u>, 105 F.3d at 849 ("As long as a work fits within one of the general subject matter categories of sections 102 and 103 [of the Copyright Act], the bill prevents the States from protecting it even if it fails to achieve Federal statutory copyright because it is too minimal or lacking in originality to qualify, or because it has fallen into the public domain.").**

Under Connecticut law, both the general tort statute of limitations and the CUTPA statute of limitations are occurrence statutes, meaning that the limitations period begins to run from the date of the act or omission complained of, rather than the date the cause of action has accrued or the injury has occurred.  See Fichera v. Mine Hill Corp., 541 A.2d 472, 475-76 (Conn. 1988).  As Plaintiffs correctly state, these statutes of limitations may be tolled by a continuing course of conduct.  To support a finding of a continuing course of conduct, "there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto."  Argus Research Group, Inc. v. Argus Media, Inc., 562 F. Supp. 2d 260, 281 (D. Conn. 2008) (quoting Neuhaus v. DeCholnoky, 905 A.2d 1135, 1143 (Conn. 2006)).  Where courts have held "that a duty continued to exist after cessation of the act or omission relied upon, there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act."  Id.  However, the continuing course of conduct doctrine has been found inapplicable where the plaintiff was aware of the alleged violation yet failed to file suit to enforce its claims.  See S. Pope Inc. v. Pope Exterminating, No. 66712, 1993 WL 489708, at *2 (Conn. Super. Ct. Nov. 17, 1993) (citing Beckenstein v. Potter & Carrier, Inc., 464 A.2d 18, 25 (Conn. 1983)).

As discussed in detail above in the context of the Court's copyright analysis, Peer began selling bearings using the 1600 Series designations in the 1960's, and Plaintiffs were aware that Peer was using these designations to sell its bearings no later than 1999.  Therefore, the statute of limitations for Plaintiffs'

state law claims based upon Peer's use of the 1600 Series designations commenced in the early 1960's and has long expired.  The continuing course of conduct doctrine cannot apply on the record before the Court because Plaintiffs were aware of Peer's use of the 1600 Series designations in 1999.  <u>See</u> <u>Pope</u>, 1993 WL 489708, at *3 (rejecting defendants' argument that the continuing course of conduct doctrine tolled the statute of limitations for their trademark claims because allowing the defendants to pursue these claims after knowing of the alleged violations for almost a decade "would violate the purpose of a statute of limitations, which is to prevent the unexpected enforcement of stale claims concerning which the persons interested have been thrown off their guard by want of prosecution").  Accordingly, Plaintiffs' state law claims are time-barred to the extent they rely upon Peer's use of the 1600 Series designations.

By contrast, the evidence in the record suggests that Peer did not begin selling bearings using the 7500 and 7600 designations until 2002, and these designations did not appear in Peer's catalog until 2005.  The occurrence that triggered running of the statute of limitations for Plaintiffs' state law claims was Peer's first sale of bearings using the 7500 and 7600 Series bearings, which ostensibly occurred in 2002.  However, Plaintiffs have alleged wrongful conduct by Peer that took place after the initial occurrence, most notably publication of the 2005 catalog including these designations.  Therefore, the continuing course of conduct doctrine tolls the statute of limitations with respect to claims based upon the 7500 and 7600 Series designations.  As discussed above in the context of Plaintiffs' trademark claims, there is no evidence in the record to suggest that

43

Plaintiffs were actually aware of Peer's use of the 7500 and 7600 Series designations.  Furthermore, there is a question of material fact with respect to when Plaintiffs acquired constructive knowledge of Peer's sales of bearings using these designations.  Thus, Plaintiffs state law claims will be allowed to proceed to trial only insofar as they rely upon allegations that Peer violated their trademark rights in the 7500 and 7600 Series designations.

### III.  Conclusion

Based on the above reasoning, the Defendant's motion for summary judgment on all counts is GRANTED IN PART and DENIED IN PART.  Plaintiffs' copyright claim is dismissed.  Plaintiffs' trademark claims and state law claims will permitted to go forward only insofar as they rely upon violation of their alleged trademark rights in the 7500 and 7600 Series designations.


IT IS SO ORDERED.


_____/s/_____

Vanessa L. Bryant
United States District Judge


Dated at Hartford, Connecticut:  October 29, 2009.


44